# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 09-12869 (JVA) |
| SENCORP, <u>et al.</u>,[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Honorable J. Vincent Aug, Jr. |
| Debtors. | ) | |
| | ) | |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS FOR THE SALE OF THE DEBTORS' ASSETS; (C) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ASSETS; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF <u>CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

## ("BID PROCEDURES/SALE MOTION")

The above-captioned debtors and debtors in possession (collectively, the "**<u>Debtors</u>**") hereby move this Court (the "**<u>Motion</u>**") for entry of an order (the "**<u>Order</u>**"), in substantially the form attached hereto as <u>Exhibit A</u>, (A) establishing bidding and auction procedures (the "**<u>Bidding Procedures</u>**") in connection with the potential sale of substantially all of the Debtors' assets (the "**<u>Assets</u>**"), free and clear of all claims (as defined by section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the

---

[1]     The Debtors in these Chapter 11 cases are:  SENCORP, Senco Products, Inc., Senco Export, Inc., SenSource Global Sourcing, LLC, TyRex, LLC, Global Fastening Solutions, LLC, Agrifast, LLC, Nexicor, LLC, Omnifast, LLC, S C FINANCIAL, INC., Senco International, Inc., Sentron Medical, Inc., and Gregg Laboratories, Inc.

"**Interests**"), except to the extent identified in a Successful Bidder's (as defined below) asset purchase agreement; (B) approving the proposed bid protections to Senco Holdings, Inc. (the "**Stalking Horse Bidder**") in accordance with that certain Asset Purchase Agreement dated May 7, 2009, (the "**Stalking Horse Asset Purchase Agreement**") for the purchase of the Assets attached hereto as Exhibit B; (C) scheduling an auction (the "**Auction**") and setting a date and time for a sale hearing (the "**Sale Hearing**") for the sale of Assets (the "**Sale**"); (D) establishing procedures for noticing and determining cure amounts for executory contracts and leases to be assigned (the "**Assumption and Assignment Procedures**"); and (E) granting certain related relief. The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (a "**Sale Order**") (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Successful Bidder's (as defined below) asset purchase agreement; and (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases. In support hereof, the Debtors respectfully represent:

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), and sections 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**Background**

A. **Background and Current Business Operations**

3. The Debtors commenced these above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 8, 2009 (the "**Petition Date**"). Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession. As of the date hereof, no creditors' committee, trustee or examiner has been appointed in any of these Chapter 11 Cases. The facts and circumstances supporting this Motion are set forth in the Affidavit of David T. Fyffe, Vice President-Chief Financial Operations and Treasurer of SENCORP, in Support of First Day Motions (the "**First Day Affidavit**"), filed contemporaneously herewith.

B. **The Debtors' Marketing and Sales Efforts**

4. Prior to the commencement of these Chapter 11 Cases, on March 9, 2009, the Debtors retained Mesirow Financial Holdings, Inc. ("**Mesirow**") to act as investment banker in an advisory capacity to evaluate financial and strategic alternatives to preserve the Debtors as a going concern and pursue a sale process to private equity investors or strategic buyers. As part of the engagement and Mesirow's evaluation, the Debtors and Mesirow aggressively pursued a potential sale of the Assets. The Debtors and Mesirow undertook exhaustive efforts to solicit interest in the Company from private equity investors and strategic buyers with the potential to acquire any portion of or substantially all of the Assets.

5. Prior to the Petition Date, the Debtors and Mesirow identified and contacted approximately 102 potential financial and strategic counterparties. Approximately 17 of these parties entered into confidentiality agreements with the Debtors and were provided extensive due diligence materials on an electronic data site (the "**Data Site**"), as well as the

opportunity to speak with the Debtors and its advisors and to conduct site visits with respect to the Assets. Seven of these parties submitted non-binding letters of intent to the Debtors (each an "**Letter of Intent**", collectively the "**Letters of Intent**").

6.      After an extensive review and in consultation with Mesirow, the Debtors, with the approval of the Debtors' board of directors, selected to Wynnchurch Capital, Ltd. **("Wynnchurch")** to be the stalking horse for the sale of the Assets. After receiving the Wynnchurch Letter of Intent on April 9, 2009, the Debtors and their advisors actively negotiated with Wynnchurch regarding the terms and conditions of an asset purchase agreement and facilitated various diligence requests made by Wynnchurch's representatives and advisors. On May 7, 2009, the Debtors and Senco Holdings, Inc., an affiliate of Wynnchurch, executed the Stalking Horse Asset Purchase Agreement.

7.      While negotiating the Stalking Horse Asset Purchase Agreement, Senco Holdings, Inc. indicated to the Debtors that a relatively expedited sale process with respect to the Assets was critical to their decision to provide a stalking horse bid. In addition, the postpetition financing (the "**DIP Facility**") is conditioned on the Debtors' pursuit of a sale process within a specified time frame. Given the Debtors' liquidity situation, the Debtors believe that a sale process that includes a sale of substantially all of the Assets will maximize value of the Debtors' estates. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties in interest to move forward with the Sale process set forth herein.

8.      Accordingly, the Debtors have proposed the following timeline for the Sale of the Assets:[2]

- May 22, 2009 – Bid Procedures Hearing

---

[2]      The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to achieve the maximum value for the Assets.

- June 5, 2009 – Submission Deadline of Materials to Become Qualified Bidder

- June 19, 2009 – Submission Deadline for Qualified Bids (as defined below)

- June 24, 2009 – Auction

- June 26, 2009 – Proposed Sale Hearing

- July 10, 2009 – Closing of Sale

**E.**     **The Asset Purchase Agreement**

9.     A summary of the principal terms of the Stalking Horse Asset Purchase Agreement, set forth in full in the Stalking Horse Asset Purchase Agreement, is as follows: [3]

- <u>Cash Consideration</u>. $41,000,000.

- <u>Assumed Liabilities</u>.  Senco Holdings, Inc. will assume up to the sum of $1,000,000 plus the Critical Vendor Adjustment Amount (as defined below) in Critical Vendor pre-petition claims.  To the extent the Assumed Critical Vendor Claims is less than the sum of $1,000,000 plus the Critical Vendor Adjustment Amount (as defined below), the purchase price will be increased, dollar-for-dollar, for the difference between the actual Assumed Critical Vendor Claims and the sum of $1,000,000 plus the Critical Vendor Adjustment Amount (as defined below).  In addition, Senco Holdings, Inc. will assume certain liabilities of up to $1,900,000 associated with customer rebates owing to certain of the Debtors' industrial customers.  Also, if, at any time on or before ten (10) days prior to the Sale Hearing (but not on or after such date), Senco Holdings, Inc. adds any Lease or Contract to <u>Schedule 1.1(a)</u> it will assume any Cure Costs resulting from any such addition(s).  Furthermore, Senco Holdings, Inc. will assume all Liabilities with respect to Ordinary-Course Operating Expenses of the Debtors to the extent accrued and not paid after the Petition Date.

- <u>Purchase Price Adjustments</u>.  To the extent the actual accounts receivable and/or inventory amounts at closing are lower than the amounts on forecasts delivered by the Debtors to Senco Holdings, Inc. by more than 3%, then the purchase price shall be reduced by the amount of such shortfall in excess of 3%.  If the Debtors spend less than $1,000,000 in discretionary Critical Vendor Payments, the difference between

---

[3]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Asset Purchase Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Asset Purchase Agreement and the terms herein, the terms of the Stalking Horse Asset Purchase Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Asset Purchase Agreement.

$1,000,000 and the amount spent (the "**Critical Vendor Adjustment Amount**") shall be deducted from the Purchase Price and added to Assumed Liabilities.

- Escrow. The purchase price will be paid in cash to the Debtors at the closing, less an escrow of $1,000,000 to secure the post-closing indemnification claims (the "**Escrow Amount**"). The Escrow Amount is Senco Holdings, Inc.'s sole remedy for any damages resulting from any breach by the Debtors of any representations, warranties or covenants and the Escrow Amount will be released at the end of the nine-month period following the closing.

- Deposit. $2,195,000.

- Critical Vendor Payments. The Debtors will pay at least $1,045,000 of prepetition claims owed to critical vendors during these Chapter 11 Cases prior to Closing to assure continued ordinary course of operations for the Debtors.

- Acquired Assets. Substantially all of the Debtors' assets; but excluding, among other things, Avoidance Actions.

- Employees. Senco Holdings, Inc. expects to extend offers for employment to substantially all of the Debtors' employees on substantially similar terms to those currently in place.

- Break-Up Fee. In the event the Debtors consummate an Alternative Transaction with a higher or better bidder, the Debtors shall pay Senco Holdings, Inc. $1,000,000 million of expense reimbursement and break-up fee.

### Relief Requested

10.     The Debtors have determined that given their liquidity, current market conditions, and the condition of the fabricated metal products market, a prompt Sale of the Assets is the best way to maximize the value of the Assets for their respective estates and creditors.

11.     Accordingly, by this Motion, the Debtors seek entry of the Bidding Procedures Order (A) approving procedures for (i) submitting bids for any or all of the Debtors' Assets, (ii) conducting an Auction with respect to the Assets on which the Debtors receive more that one bid ("**Competing Bids**"); (B) approving the proposed bid protections to the Stalking Horse Bidder; (C) scheduling the Auction and a Sale Hearing with respect to any bid accepted by

the Debtors; and (D) establishing Notice (as defined herein) and Assumption and Assignment Procedures.

12.     The Debtors also request that this Court to set a Sale Hearing on or before June 29, 2009, but reserve the right to extend the Sale process, including, but not limited to, the applicable bid deadline and Auction date, and request a continuance of the Sale Hearing.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order approving the Sale of substantially all of the Assets free and clear of all interests and/or additional postpetition financing for the business and authorizing the assumption and assignment of certain executory contracts and unexpired leases. A form of Sale Order will be filed by the Debtors before the Sale Hearing.

**Basis for Relief**

13.     The events leading to these Chapter 11 Cases are set forth in the First Day Affidavit.

14.     In furtherance of the Debtors' duty to maximize the value of their estates and in accordance with their obligations under the DIP Facility, the Debtors have filed this Motion seeking approval of a Sale process, including the Bidding Procedures.[4]

**A.     Necessity for Sale**

15.     The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue, including an attempt to raise cash through a refinancing of their prepetition credit facility and other strategic transactions.  To date, none of these options has been successful.  Given current economic market conditions, including unfavorable conditions in the fabricated metal products market, the Debtors' liquidity situation has not improved.

---

[4]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Stalking Horse Asset Purchase Agreement.

16.     As set forth above, the Debtors presently face the possibility of continued financial deterioration.  However, the Debtors have managed to obtain necessary financing to conduct the Sale process proposed herein.  Accordingly, the Debtors have decided to pursue a Sale of all of the Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

17.     As indicated above, the Debtors have marketed and solicited offers for the Sale of substantially all of the Assets for the last two months.  The Debtors have received a binding offer from Senco Holdings, Inc. for substantially all of the Assets and the Debtors are confident that the Sale process will maximize the value of the Assets.

**B.      The Bidding Procedures[5]**

18.     In order to maximize the value of the Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery.  As described more fully in the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order attached hereto as <u>Exhibit A</u>, the Debtors may sell all of the Assets to any bidder that makes the highest or otherwise best offer for the Assets.

19.     As described more fully in the Bidding Procedures, the Debtors propose that competing bids for the Assets be governed by the following:[6]

> **Participation Requirements**:  Any person that wishes to participate in the Bidding Process (a "**Potential Bidder**") must become a "Qualified Bidder" (defined below).  As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver (unless previously delivered) to the Debtors and to the

---

[5]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

[6]     The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

Committee at the addresses specified below, by the Bid Deadline (as defined below):

    i.    An executed confidentiality agreement in form and substance acceptable to the Debtors;

    ii.    A letter of indication stating the estimated purchase price and consideration for the Assets (including any assets to be excluded from such bid, if any), clearly indicating total cash consideration to be provided to the Debtors at closing and specifying any deductions from the total cash consideration and which items, if any, the Debtors would be required to pay at closing; and

    iii.    Sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the bidder has the financial wherewithal to close a sale of the Assets, including, but not limited to, a signed commitment for any debt or equity financing, a bank account statement showing the ability of a Potential Bidder to pay cash for the Assets, and current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee the obligations of the Potential Bidder.

A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in subparagraphs (i) – (iii) above, and that the Debtors, in consultation with the Committee and the Secured Lenders, determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors), to submit a *bona fide* offer and be able to consummate a sale if selected as the Successful Bidder (defined below). Notwithstanding the foregoing, the Stalking Horse Bidder and the Secured Lenders shall be deemed Qualified Bidders. Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraph (i) – (iii) above, the Debtors shall determine, in consultation with the Committee and the Secured Lenders, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

**Bid Deadline**: A Qualified Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials (defined below) to (i) the Debtors, c/o Global Fastening Solutions, LLC, 4270 Ivy Pointe Blvd., Cincinnati, Ohio 45245 (Attn: General Counsel); (ii) counsel to the Debtors, Latham & Watkins LLP, Suite 5800, 233 South Wacker Drive, Chicago, Illinois 60606 (Attn: Stephen R. Tetro II, Esq.); (iii) financial advisors to the Debtors, Mesirow Financial, Inc., Investment Banking Group, 321 North Clark Street, 13th Floor, Chicago Illinois 60654 (Attn: Jeffrey Golman); (iv) counsel to the Creditors' Committee; and (vi) counsel to the Secured Lenders, Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago Illinois 60661 (Attn: John Sieger, Esq.

and Peter Siddiqui, Esq.), not later than 5:00 p.m. (prevailing Eastern time) on June 19, 2009 (the "**Bid Deadline**").  In the event that a bid is determined to be a Qualified Bid for the Assets, the Debtors shall deliver a written copy of any such Qualified Bid to the Stalking Horse Bidder's counsel Vedder Price P.C., 222 North LaSalle Street, Chicago, Illinois  60601 (Attn:  Michael A. Nemeroff, Esq.).

**Bid Requirements**:  All bids, other than the Stalking Horse Bid, must include (unless such requirement is waived by the Debtors, *provided* that such waiver will not to be granted without the prior written consent of the Stalking Horse Bidder) the following information and documents (the "**Required Bid Materials**"):

(i.) A cash purchase price equal to or greater than $43,050,000 (the "**Minimum Bid Amount**").

(ii.) A letter stating that the bidder's offer is irrevocable until the first business days after the Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court.

(iii.) An executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement reflecting variations from the Stalking Horse Asset Purchase Agreement.  All Qualified Bids must provide (a)(i) if cash consideration (the "**Cash Consideration**") is less than $65,000,000,  a commitment to close within eleven days after the entry of the Sale Order or (ii) if the Cash Consideration is greater than or equal to $65,000,000, a commitment to close as soon as reasonably practicable following the entry of the Sale Order; (b) a representation that the Qualified Bidder will make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("**HSR**") and pay the fees associated with such filings; and (c) the identity of and contact information for the bidder and full disclosure of any affiliates involved in such bid.

(iv.) A cash deposit in the amount of $2,195,000 (the "**Bid Deposit**") which shall be placed in a segregated account (the "**Escrow Account**").  The Escrow Account shall not be subject to the claims, liens, security interests, or encumbrances of the Debtors' creditors, including those creditors serving as debtor-in-possession or cash collateral lenders to the Debtors, and funds shall be disbursed from the Escrow Account only as follows:  (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be used to satisfy any Break-Up Fee to which the Stalking Horse Bidder is entitled hereunder by reason of its not being the Successful Bidder, with the balance, if any, to be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, and (ii) if such

Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall be returned to it (subject to the other provisions of these Bid Procedures and the terms of its asset purchase agreement with the Debtors).

(v.) A representation of the bidder and written evidence that the bidder has a commitment for financing or other evidence of proposed purchaser's ability to consummate the proposed transaction and which the Debtors, in consultation with the Committee and the Secured Lenders, believe to be sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Bankruptcy Code section 365.

(vi.) The bid shall identify with particularity the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors.

(vii.) The bid shall not request or entitle the bidder to any transaction or break up fee, expense reimbursement, termination or similar type of fee or payment.

(viii.) The bid shall not contain any due diligence, financing or regulatory contingencies of any kind, provided that the bid may be subject to the satisfaction of specific conditions in all material respects at closing.

(ix.) The bid shall fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

(x.) The bid shall state that the offering party consents to the core jurisdiction of the Bankruptcy Court.

(xi.) The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials is a "**Qualified Bid**." The Debtors, in consultation with the Committee and the Secured Lenders, reserve the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest or best offer. Notwithstanding the bid requirements detailed above, the Stalking Horse Bid shall be deemed a Qualified Bid.

**The Auction and Auction Procedures**:  If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the

Debtors may conduct an Auction with respect to all or some of the Assets. The Auction shall be conducted at the offices of Frost Brown Todd LLC, 2200 PNC Center 201 East Fifth Street, Cincinnati, Ohio 45202 (the "**Auction Site**") at 11:00 a.m. (prevailing Eastern time) on June 24, 2009 (the "**Auction Date**"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

Except as otherwise provided herein, or as restricted by the Stalking Horse Asset Purchase Agreement, based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in consultation with the Committee and the Secured Lenders, may conduct the Auction in any manner that they determine will achieve the maximum value for the Assets. Except as provided in the Stalking Horse Asset Purchase Agreement, the Debtors thereafter, in consultation with the Committee and the Secured Lenders, may offer the Assets in such successive rounds as the Debtors, in consultation with the Committee and the Secured Lenders, determine to be appropriate so as to obtain the highest or otherwise best bid or combination of bids for the Assets. Except as otherwise provided herein or as restricted by the Stalking Horse Asset Purchase Agreement, the Debtors, in consultation with the Committee and the Secured Lenders, also may set opening bid amounts in each round of bidding as the Debtors determine to be appropriate.

If Qualified Bidders submit Qualified Bids, then as soon as practicable after the conclusion of the Auction, the Debtors, in consultation with the Committee and the Secured Lenders, shall (i) review each Qualified Bid on the basis of the financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest or otherwise best offers for the Assets (to the extent any such bid is acceptable to the Debtors, in consultation with the Committee and the Secured Lenders, each a "**Successful Bid**" and each bidder making such bid, a "**Successful Bidder**"). At the Sale Hearing, the Debtors, after consultation with the Committee and the Secured Lenders, may present any Successful Bids to the Bankruptcy Court for approval. The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court. The Debtors acknowledge that the Stalking Horse Bid is a Qualified Bid and shall be submitted to the Bankruptcy Court for approval in the event that there are no other Successful Bids. Except as otherwise provided herein or as restricted by the Stalking Horse Asset Purchase Agreement, the Debtors, in the exercise of their fiduciary duties, may adopt rules for bidding at the Auction that, in its business judgment, will better promote the goals of the bidding process, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

If no Qualifying Bid is submitted by the Bid Deadline, the Debtors shall cancel the Auction and accept the Stalking Horse Bid (in which case, the Successful Bid

shall be the Stalking Horse Bid, and the Successful Bidder shall be the Stalking Horse Bidder).

**Overbid Amount**.  There shall be an overbid amount that a Qualified Bidder must bid to exceed the Stalking Horse Bid ("**Overbid Amount**"), and that amount shall be $2,050,000.  The Debtors shall not be allowed or authorized to accept a Qualified Bid amount less than the Overbid Amount, unless the Debtors have deemed the Stalking Horse Bid a Successful Bid.

**Minimum Bid Increment.**  There shall be a minimum bid increment of at least $150,000 for all bids made by Qualified Bidders.  For example, if a Qualified Bidder bids the Overbid Amount, the next bid cannot be less than $43,200,000 ($43,050,000 plus $150,000).  The Debtors will take into account the Break-Up Fee in each round of bidding.

**C.**      **Stalking Horse Asset Purchase Agreement and Bid Protection**

20.     In order to provide an incentive and to compensate the Stalking Horse Bidder for entering into the Stalking Horse Asset Purchase Agreement, the Debtors have agreed to an expense reimbursement and break-up fee in the amount of $1,000,000 million (the "**Break-Up Fee**") to reimburse the Stalking Horse Bidder for costs and expenses incurred in connection with the Stalking Horse Bidder's attempted purchase of the Assets.  The Debtors will take into account the Break-Up Fee in each round of bidding.

21.     The Debtors believe that offering the Break-Up Fee to the Stalking Horse Bidder will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding.  The availability of the Break-Up Fee is necessary in order to provide the Stalking Horse Bidder with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Assets and the risk that arises from participating in the bidding and subsequent Auction process.

**D.**      **Credit Bidding**

22.     In connection with the Sale of substantially all of the Assets, if the Cash Consideration provided by the Successful Bidder is less than all outstanding prepetition and

postpetition debt due and owing to the Debtors' prepetition secured lenders (the "**Prepetition Secured Lenders**"), and the postpetition lenders under the Debtors' existing debtor-in-possession financing facilities (the "**DIP Lenders**" and together with the Prepetition Secured Lenders, collectively, the "**Secured Lenders**"), the Secured Lenders may seek to credit bid some or all of their claims for their respective collateral (a "**Credit Bid**"). The Debtors do not anticipate that the Cash Consideration offered for the Assets will be less than the amount of all indebtedness due and owing to the Secured Lenders. Notwithstanding the foregoing, the Debtors seek this Court's allowance of credit bidding in connection with any Sale to the extent of Bankruptcy Code section 363(k).

**E.        Notice of Bid Procedures and Sale**

23.        <u>Notice of Sale Hearing</u>. Within three (3) days after the entry of the Bidding Procedures Order (the "**Mailing Date**") or as soon as thereafter as practicable, the Debtors (or their agents) shall serve the Motion, the Stalking Horse Asset Purchase Agreement, the Bidding Procedures and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to the Assets during the past two (2) months; (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets; (iii) all parties to executory contracts and unexpired leases; (iv) counsel to the post-petition lender; (v) the Prepetition Secured Lenders; (vi) all federal, state, county and local regulatory and foreign or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (vii) the United States Attorney's Office; (viii) the Internal Revenue Service; (ix) the Securities and Exchange Commission; (x) the Pension Benefit Guaranty Corporation; and (xi) those parties who

have filed the appropriate notice requesting notice of all pleadings filed in these cases (the "**Sale Notice Parties**").

24. <u>Sale Notice</u>. On the Mailing Date or as soon as thereafter as practicable, the Debtors (or their agents) shall serve by first class mail, postage prepaid, a sale notice (the "**Sale Notice**"), substantially in the form attached hereto as <u>Exhibit C</u>, upon all other known creditors of the Debtors.

25. <u>Publication Notice</u>. The Debtors also propose, pursuant to Bankruptcy Rule 2002(l) and 2002(d), that the publication of the Sale Notice, attached hereto as <u>Exhibit D</u>, in *The Wall Street Journal* and the *Cincinnati Enquirer*, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

26. <u>Post Auction Notice</u>. As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder (the "**Post Auction Notice**"), substantially in the form attached hereto as <u>Exhibit E</u>. The Post Auction Notice will be available on the website maintained by the Debtors' noticing agent at http://www.sencorp-reorg.com.

**F.    <u>Assumption and Assignment Procedures</u>**

27. The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts with respect to those executory contracts and unexpired leases that the Debtors may seek to assume and assign (the "**Assumed Contracts**").

28. Within ten (10) business days after entry of an order approving the Bidding Procedures or as soon as thereafter practicable, the Debtors will file a notice of cure

amounts (the "**Cure Notice**"), substantially in the form attached hereto as <u>Exhibit F</u>, with this Court and serve the Cure Notice on all non-debtor parties to any executory contracts and unexpired leases for the Debtors (the "**Contract Notice Parties**") that may be assumed by the Debtors and assigned to any Successful Bidder.

29.     The Cure Notice shall state the cure amounts that the Debtors believe are necessary to assume such executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**") and notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the Auction.  The Cure Notice shall set a deadline by which the non-debtor party shall file an objection to the Cure Amount.  The Debtors request that this Court set the deadline to object to any Cure Amount as fourteen (14) days after service of the Cure Notice.  The Cure Notice shall also provide that objections to any Cure Amount will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

30.     As soon as possible after the conclusion of the Auction, the Debtors shall file with this Court a Post Auction Notice that identifies any Successful Bidder and provides notice that the Debtors will seek to assume and assign certain of the Assumed Contracts at the Sale Hearing.

31.     At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request entry of any order requesting approval of the assumption and assignment of any or all executory contracts and unexpired leases, including subleases or other occupancy agreements, identified on Schedule 1.1(a) of the Stalking Horse Asset Purchase Agreement to any Successful Bidder.  For

the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties in interest.

32.     At the conclusion of the Sale Hearing, the Debtors will file a notice substantially in the form of the notice attached hereto as Exhibit G and serve on all Contract Notice Parties that identifies the Successful Bidder and provides notice of which Assumed Contracts the Debtors will assume and assign to the Successful Bidder (the "**Assumption Notice**").

### Applicable Authority

33.     Directors of Ohio corporations must be informed, act in good faith and have the corporation's best interest in mind when making business decisions. See Ohio Rev. Code § 1701.59. Under Ohio law, the business judgment rule operates as a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. See Radol v. Thomas, 772 F.2d 244, 256-257 (6th Cir. 1985). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.

34.     The Debtors have sound business justifications for selling the Assets at this time. Success in the fabricated metal products business requires significant liquidity. While the Debtors currently have limited access to capital, they are endowed with a strong customer base. Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of substantially all of the Assets.

**A.    The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Assets**

35.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for the sale of substantially all of the Assets as determined by the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") and Secured Lenders.

36. The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties in interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.** **The Break-Up Fee Is Necessary To Preserve the Value of the Debtors' Estates**

37. Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the bid protections (as outlined in the Bidding Procedures) to Senco Holdings, Inc. will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

38. Approval of the bid protections to Senco Holdings, Inc. is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.

Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

39.     The Sixth Circuit has used a two-part test to determine whether a claim is entitled to status as a general administrative expense.  First, the claim must arise from a transaction with the bankruptcy estate.  Second, it must directly and substantially benefit the estate.  Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 816 (6th Cir. 1997).

40.     In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

A.      the presence of self-dealing or manipulation in negotiating the breakup fee;

B.      whether the fee harms, rather than encourages, bidding;

C.      the reasonableness of the break-up fee relative to the purchase price;

D.      whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

E. the ability of the request for a break-up fee serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

F. the correlation of the fee to a maximum of value of the debtor's estate;

G. the support of the principal secured creditors and creditors committees of the break-up fee;

H. the benefits of the safeguards to the debtor's estate; and

I. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

41. <u>Stalking Horse Bidder Bid Protection</u>. The Break-Up Fee set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Asset Purchase Agreement – a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Break-Up Fee. Without the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidder.

42. Moreover, payment of the Break-Up Fee will not diminish the Debtors' estates. The Break-Up Fee is only payable if a Sale to a higher or better bidder is consummated.

## C.  **Credit Bidding Should be Authorized**

43.  A secured creditor is allowed to "credit bid" the amount of its claim in a sale.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363 of the Bankruptcy Code, unless this Court for cause orders otherwise, the holder of a claim secured by property that is subject of the sale "may bid at such sale, and, if the holder of such claims purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

44.  Pursuant to the Bidding Procedures, the Debtors' Secured Lenders are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code if the Cash Consideration offered for the Assets is less than the amount of all indebtedness due and owing to the Secured Lenders.  The Debtors do not anticipate that the Cash Consideration offered for the Assets will be less than the amount of all indebtedness due and owing to the Secured Lenders.

## D.  **Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

45.  Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although Bankruptcy Code section 363 does not specify a

standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

46.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Stephens Industries, Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the Assets at this time. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all of the Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed Sale.

47. The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their businesses for the benefit of the Debtors' estates and their creditors. The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[7]

48. In addition, all creditors and parties in interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and its creditors and parties in interest.

**E. The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

49. Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). See In re Wolverine radio Co., 930 F.2d 1132, 1147

---

[7] The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

50.     The Debtors believe that the Secured Lenders will consent to the sale free and clear under section 363(f)(2). In the event they do not, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the Secured Lenders' liens will attach to the proceeds of the Sale and the Debtors will establish at the Sale Hearing that the Secured Lenders can be compelled to accept a monetary satisfaction of their claims.

51.     The Debtors propose that any bona fide and allowed Interests shall attach to the Sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale.

**F.      A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

52.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. In re Made In Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); Abbotts Dairies of Penn., 788 F.2d at 147.

53.     The Stalking Horse Asset Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their Assets, the Debtors submit that Senco Holdings, Inc.'s proposal as contained in the Stalking Horse Asset Purchase Agreement represents Senco Holdings, Inc.'s highest and best offer for the Assets. Additionally,

the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all of the Assets had negotiated at arm's-length, with all parties represented by their own counsel.

54. Accordingly, the Sale Order will include a provision that the Successful Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**G.**     **The Assumption and Assignment of Executory Contracts and Unexpired Leases**

55. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more

exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

56.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors fee assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

57.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract... only if the trustee assumes such contract... and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  Accord In re Bygaph, Inc., 56 B.R. 596,

605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.     Wynnchurch, the parent company of Senco Holdings, Inc., is a Chicago-based private equity investment firm that specializes in investing in and acquiring middle-market companies in the United States and Canada.   Wynnchurch has a wealth of experience and success in improving the performance of its portfolio companies combined with its financial resources of over $500 million of capital under management makes Wynnchurch's subsidiary, Senco Holdings, Inc., an ideal purchaser for the Debtors' Assets.   Upon closing, the Stalking Horse Bidder, will have financial resources that are more than sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors.   Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Senco Holdings, Inc. or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them.   The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts that it seeks to assume.

59.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.   Such Contract Notice Parties will then be given an opportunity to

object to such notice. If an objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

60. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale of the Assets, the Debtors will cure any such default prior to such assumption and assignment. Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

61. Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases. This Court therefore should have a sufficient basis to authorize the Debtors to assume and assign contracts as may be set forth in any Successful Bidder's asset purchase agreement.

**H.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

62. Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property… is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease… is stayed until the expiration of the 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that any Sale Order be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**I.      Payment of Secured Creditors at Closing**

63. At the Sale Hearing, the Debtors expect that they will seek approval to pay certain or all of the allowed secured claims out of the proceeds of such creditors' collateral.

## Notice

64.     No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases.  The Debtors have provided notice of this Motion to:  (i) the Office of the United States Trustee for the Southern District of Ohio; (ii) counsel to the administrative agent for the Debtors' prepetition lenders; (iii) counsel to the administrative agent for the Debtors' proposed debtor-in-possession lenders; (iv) counsel to Wynnchurch; (v) the creditors listed on the Debtors' consolidated list of thirty largest unsecured creditors, as filed with the chapter 11 petitions; (vi) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (vii) any governmental unit listed in Local Bankruptcy Rules 5003-1(d); and (viii) those parties who have filed the appropriate notice requesting notice of all pleadings filed in these cases.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.  **Please take notice that the Debtors have filed a Motion for an Expedited Hearing to consider First Day Motions and Applications, including this Motion.  The Debtors have requested that the Court consider the entry of an order approving the Bidding Procedures at a hearing on or before May 22, 2009.  The Debtors shall serve notice of the objection deadline and hearing date pursuant to further order(s) of this Court.**

## No Prior Request

65.     No prior motion for the relief requested herein has been made to this Court or any other Court.

## Waiver of Memorandum of Law

66.     This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, the Debtors respectfully submit that

such citations and discussion satisfy the requirements that the Debtors submit a separate memorandum of law in support of this Motion pursuant to Local Bankruptcy Rule 9013-1(a).

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form attached hereto, (i) approving the Bidding Procedures; (ii) approving the Break-Up Fee and Bid Protections; (iii) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; and (iv) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing that this Court enter a Sale Order subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the Sale; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting such other and further relief as this Court deems appropriate.

Dated: May 8, 2009
Cincinnati, Ohio

Respectfully submitted,

**LATHAM & WATKINS LLP**

Josef S. Athanas (pro hac vice motion pending)
Stephen R. Tetro II (pro hac vice motion pending)
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606-6401
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

*- and -*

**FROST BROWN TODD LLC**

By: /s/ Ronald E. Gold
    Ronald E. Gold, Esq. (0061351)
    Beth A. Buchanan, Esq. (0068430)
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: rgold@fbtlaw.com
Email: bbuchanan@fbtlaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**